UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | No. 19 CR 226-2 |
| v. | Honorable Virginia M. Kendall |
| JAN R. KOWALSKI | |

### GOVERNMENT'S SENTENCING MEMORANDUM

The UNITED STATES OF AMERICA, by and through its attorney, JOHN R. LAUSCH, JR., United States Attorney for the Northern District of Illinois, hereby submits the following sentencing memorandum.

The defendant engaged in a continuing bankruptcy fraud scheme to enable her brother, co-defendant Robert M. Kowalski, to conceal more than $357,000 from Robert's creditors, and later a bankruptcy trustee. Defendant, a licensed attorney, used her attorney trust account (IOLTA) to conduct approximately 100 separate transactions with these concealed funds in furtherance of the scheme. Defendant thereafter fabricated documents and made materially false statements to the United States Bankruptcy Court (both in a written filing and in sworn testimony from the witness stand) in an effort to conceal the scheme and the funds. Accordingly, the defendant should be sentenced within the advisory Guidelines range of 37 to 46 months' incarceration followed by 3 years' supervised release.

# I. BACKGROUND

On March 10, 2019, the defendant was charged by complaint with bankruptcy fraud. An indictment was returned against the defendant on March 28, 2019 (Dkt. 37), and that indictment was thereafter superseded on February 6, 2020 (First Superseding Indictment, Dkt. 85), August 27, 2020 (Second Superseding Indictment, Dkt. 120), February 25, 2021 (Third Superseding Indictment, Dkt. 250), and December 7, 2021 (Fourth Superseding Indictment, Dkt. 534). The Fourth Superseding Indictment charged the defendant with four counts of bankruptcy fraud, in violation of Title 18, United States Code, Section 157, paragraphs (1), (2), and (3) (Counts Eleven through Fourteen), and one count of concealing assets from a bankruptcy trustee, in violation of Title 18, United States Code, Section 152(1) (Count Fifteen). On March 3, 2022, the defendant pleaded guilty to Count Fifteen pursuant to a written plea agreement. Dkt. 670. The sentencing hearing is currently set for February 3, 2023, at 12:30 PM.

# II. DEFENDANT'S OFFENSE CONDUCT

The defendant engaged in a continuing fraud scheme to enable her brother, co-defendant Robert M. Kowalski, to conceal more than $357,000 from his creditors, and later a bankruptcy trustee. Defendant, while a licensed attorney, used her IOLTA account to conduct approximately 100 separate transactions with the concealed funds in furtherance of the scheme. Essentially, at the time Robert filed bankruptcy, he had hundreds of thousands of dollars in cashier's checks payable to himself which were property of his bankruptcy estate and which he did not disclose in his filings with the

United States Bankruptcy Court. Defendant helped Robert conceal the funds represented by the cashier's checks, as well as money orders and other checks payable to Robert, by depositing them into defendant's IOLTA account. During Robert's bankruptcy, defendant withdrew a portion of these funds for use in real estate transactions and attempted real estate transactions for Robert's benefit. Defendant converted the remainder of the concealed funds into cashier's checks payable to Robert. Defendant eventually redeposited the majority of these checks back into her IOLTA account. Finally, defendant withdrew all of the remaining concealed funds in cash. Clearly, defendant's conduct was designed and intended to help Robert conceal these funds and his continuing control of them. When the bankruptcy trustee discovered the IOLTA account activity, the defendant fabricated documents and made materially false statements to the United States Bankruptcy Court (both in a written filing and in sworn testimony from the witness stand) in an effort to conceal the fraud scheme. The funds concealed through the defendant's scheme have yet to be recovered.

A brief summary of the defendant's fraudulent actions is set forth below, and described in more detail in the criminal complaint (Dkt. 1) and the Government's Version of the Offense.

### 1. Use of Defendant's IOLTA Account to Conceal Funds

On March 29, 2018, Robert M. Kowalski filed his voluntary Chapter 11 bankruptcy petition commencing *In re Robert M. Kowalski*, Case No. 18-09130, in the United States Bankruptcy Court for the Northern District of Illinois (the Kowalski Bankruptcy Case). Initially, Robert exercised control over the bankruptcy estate as a debtor-in-possession, but, on July 26, 2018, he was removed by the bankruptcy court for cause and a chapter 11 trustee was appointed. The defendant was aware of the Kowalski Bankruptcy Case no later than June 26, 2018, when she attended a meeting of creditors conducted in the case.[1] The defendant was aware that the filing of the Kowalski Bankruptcy Case created an estate comprised of all legal and equitable interests that Robert held as of the commencement of the case. Dkt. 670 at 3.

---

[1] In the plea agreement and Government's Version it is reported that defendant attended the May 24, 2018, creditors' meeting. Review of the transcript of that meeting does not confirm her attendance, however. It is possible that defendant attended the May 24 meeting and her presence was not noted on the record as she was neither a creditor nor the debtor's bankruptcy counsel at the time. The defendant was present at the June 26, 2018, creditors' meeting, where her presence is acknowledged on the record because she entered the room after the meeting had begun. In any event, the defendant was aware of the Kowalski Bankruptcy Case at least two months' prior to the commencement of the fraudulent activity with her IOLTA account, and there is cause to believe that she was aware of the bankruptcy filing since its commencement, as she attended pre-filing meetings with her brother at the office of the filing bankruptcy attorney, Joseph Cohen.

Defendant used her IOLTA account[2] to conceal a total of approximately $357,000[3] from creditors and the bankruptcy trustee in the Kowalski Bankruptcy Case. Dkt. 670 at 3-4.

Specifically, between August 31 and October 25, 2018, the defendant concealed 36 cashier's checks payable to Robert M. Kowalski and totaling $352,166.92 by depositing the checks into her IOLTA account. Dkt. 670 at 4; *see also*, summary chart attached as Exhibit A. These cashier's checks had been purchased between August 31, 2017, and August 13, 2018, and for 34 of the 36 checks Robert was the remitter in addition to being the payee. *See* Exhibit A.

In September and October of 2018, the defendant concealed five instruments (checks and money orders) payable to Robert M. Kowalski for rent and totaling $3,400 by depositing them into her IOLTA account. Dkt. 670 at 4; *see also*, summary chart attached as Exhibit B. On September 10 and 21, 2018, the defendant concealed three instruments (checks and money orders) payable to Indomitable LLC for rent and totaling $1,926 by depositing them into her IOLTA account. Exhibit B.

---

[2] An IOLTA Account is a pooled client trust account, which is to be used to hold "property of clients or third persons that is in a lawyer's possession in connection with a representation" and should be kept "separate from the lawyer's own property." *See* Illinois Rule of Professional Conduct 1.15. According to the Illinois Attorney Registration & Disciplinary Commission, "[a] lawyer's failure to segregate client and third-party funds from the lawyer's own personal or business funds constitutes comingling, which the Illinois Supreme Court has consistently condemned as a serious breach of a lawyer's professional and ethical duties." *See* https://www.iardc.org/EducationAndOutreach/ClientTrustAccounts, last accessed January 19, 2023.

[3] The government's position at sentencing is that the total concealment is $357,496.92, consisting of deposits of: $352,166.92 in cashier's checks, $3,400 in rent payments to Robert M. Kowalski, and $1,926 in rent payments to Indomitable LLC, an entity that was property of the bankruptcy estate. This figure is slightly lower than the $364,600 reported in the plea agreement and Government's version.

On or around October 12, 2018, defendant withdrew approximately $75,682[4] of the funds concealed in her IOLTA account through a wire transfer for use in the purchase of property located at 6821 West 96th Street, Oak Lawn, Illinois (the Oak Lawn Property), in the name of a nominee of Robert M. Kowalski. Dkt. 670 at 5; *see also*, summary chart attached as Exhibit D.

On or around September 13, 2018, the defendant withdrew approximately $2,500 of the funds concealed in her IOLTA account to purchase a cashier's check for use as earnest money in Robert M. Kowalski's attempt to purchase 9441 South Indiana Avenue, Chicago, Illinois, in the name of a fictitious trust of which Robert was the beneficiary. Dkt. 670 at 5; *see also*, summary chart attached as Exhibit E.

Between September 5 and October 29, 2018, the defendant used the funds in her IOLTA account to purchase 20 cashier's checks payable to or for the benefit of Robert M. Kowalski in the total aggregate amount of approximately $350,300. Dkt. 670 at 5; *see also*, summary chart attached as Exhibit F. The defendant thereafter caused 14 of these cashier's checks, in the aggregate amount of approximately $325,900, to be redeposited into her IOLTA account in transactions from October 12 through December 5, 2018. Dkt. 670 at 5-6; Exhibit F.

---

[4] The plea agreement and Government's Version identified $96,600 as being drawn from defendant's IOLTA account for the purchase of the Oak Lawn Property. While approximately $96,600 of the bankruptcy estate's assets were used to purchase the property, only the final wire transfer of $75,682.86 was drawn from defendant's IOLTA account. The remaining $21,000 was comprised of 3 cashier's checks Robert M. Kowalski purchased from an account held in the name of Indomitable LLC at Byline Bank between June 18 and July 24, 2018. *See* summary chart attached as Exhibit C.

Between November 13 and December 7, 2018, the defendant made 21 cash withdrawals totaling approximately $241,842 from her IOLTA account. Dkt 670 at 6; *see also*, summary chart attached as Exhibit G.

### 2. False Written Representations Made to Bankruptcy Court in Pleading Filed by Defendant in her Capacity as an Attorney

On November 26, 2018, the defendant filed an appearance for Robert M. Kowalski in the Kowalski Bankruptcy Case. She continued to represent Robert M. Kowalski in the case through at least in or around January 2019. Dkt. 670 at 4.

On January 9, 2019, the defendant filed a Combined Response to Trustee's Motion For Accounting and Turnover of Estate Funds Against Jan Kowalski and Rule to Show Cause Against Jan Kowalski and Debtor (Combined Response), in the Kowalski Bankruptcy Case. In the Combined Response, the defendant falsely represented that the approximately $357,000 concealed using her IOLTA account, including cashier's checks for which Robert M. Kowalski was both the remitter and the payee and checks payable to Robert, were not property of the estate in the Kowalski Bankruptcy Case. Dkt. 670 at 6. More specifically, the defendant represented to the bankruptcy court that: the funds "are not and never were property of the Debtor's estate;" "there was a completed transfer of ownership" of the funds to the defendant; and "Debtor's funds were not paid out of [defendant's] IOLTA account." *See* Combined Response, Exhibit H.

### 3. False Testimony and Fabricated Documents Presented to Bankruptcy Court by Defendant

On January 14, 2019, the defendant testified under oath during a hearing in the Kowalski Bankruptcy Case and made numerous false statements designed and intended to deceive creditors and the trustee. Dkt. 670 at 6. Among these false statements were that the hundreds of thousands of dollars in cashier's checks in which Robert M. Kowalski was both the remitter and the payee which the defendant deposited in her IOLTA account were not property of the estate; but instead, were attorney's fees; and that these hundreds of thousands of dollars in attorney's fees became due and payable to the defendant upon execution of retention agreements with Indomitable LLC, Piorun Properties LLC, and Burros Blancos. *Id*. at 6-7. In connection with her testimony on January 14, 2019, the defendant introduced exhibits into the record, including purported IOLTA trust account client ledgers and retention agreements which she knew were false, after-created, and back-dated to support her false testimony. *Id*. at 7.

The defendant came to testify on January 14, 2019, as a witness called by her co-counsel, Mr. Ernesto Borges. *See* transcript attached as Exhibit I. The defendant's direct examination from her co-counsel was extensive, and her false testimony was clearly planned in advance. *See id*. at 5:1-74:19. The defendant appeared on January 14, 2019, with an explanation for every aspect of the activity in her IOLTA account. The defendant explained away the extensive delays between the dates instruments were issued and the dates they were negotiated as attributable to her dislike of

8

preparing ledgers, in one instance testifying about a particular series of ledger entries:

> A.     […] On or about February 1st of 2018 I received three cashier's checks totaling $30,000.
>
> Q.     What are those -- the number on those cashier's checks?
>
> A.     7082, 7083 and 7084. And they're all deposited on September 11th, 2018.
>
> Q.     So you had those checks for some seven -- seven months, more than seven months it appears?
>
> A.     That's correct.
>
> Q.     And, again, why did you not deposit those checks?
>
> A.     Again, two matters. Number one, the cashier's checks are good for five years.
>
>     And the second thing was I greatly dislike preparing these [ledger] statements. I prefer to only do them. Unfortunately, I have to do them at some time, so I have chosen at the end of the year when I have to zero out my account anyways. These represent my earned fees.

*Id*. at 51:15-52:9.[5]  To explain the cashier's checks drawn on, and then recycled back into, her IOLTA account, the defendant testified:

> BY MR. BORGES:
> Q.     There's a -- this cashier's check is payable to Robert M. Kowalski, and the remitter is Jan Kowalski Client Fund Trust. Can you explain that transaction.
>
> A.     Yes, certainly. September 10, 2018, I made a counter withdrawal where I directed the IOLTA, my -- Bank of America, the entity that holds my IOLTA account, to draw a cashier's check payable to my brother for $25,000.

---

[5] When defendant was confronted on cross-examination about her purported receipt of a cashier's check in December of 2017 that was not negotiated until August 31, 2018, she stated: "That's for my tax purposes. I didn't want to declare that much earnings in 2017, so I held it until 2018." *Id*. at 94:10-12.

This was a loan to my brother representing my fees that I had earned, because he wasn't working back then in September of 2018, and he had been removed and -- as a debtor in possession and he needed money. So I was going to loan him money.

Q.   So these were monies that you loaned to him?

A.   That I intended to loan to him, but I believe I re -- I did not loan them to him. I just redeposited them back into my IOLTA account.

Q.   I see.

There's another check dated -- there's another check dated September 5th. This is Trustee's Exhibit page 287, for $10,000, a cashier's check.

MR. BORGES: If I may approach, Your Honor?

THE WITNESS: Yes, I see that.

BY MR. BORGES:

Q.   And what is that?

A.   Again, that's a cashier's check that I had caused to be drawn from my earned funds in my IOLTA account, and I wanted to make a loan to my brother of that amount of money. But I changed my mind, and I later just deposited the funds, my earned funds, back into the IOLTA account.

Q.   So these were monies that you -- because it says not used for -- these were monies that you redeposited, so they weren't used for the intended purpose?

A.   Exactly.

Q.   These were your monies?

A.   That's correct. I had earned those fees.

Q.   So is it fair to say that there are a number of checks that we've gone over this, a number of checks that you made payable to your brother, intended loans that were not -- not used for the intended purpose?

A.   That's correct. There was about over a hundred thousand dollars.

Q.   And what did you do with those checks?

A.    I redeposited them back into the IOLTA account. They were not used for that purpose. And then I withdrew them as my earned fees. And, of course, my fees will show up on my 2018 tax return.

Q.    Okay. So you're saying that these were your earned fees in your IOLTA account that you had not put into your personal account?

A.    That's exactly right.

*Id.* at 70:9-72:16. The defendant closed out the direct examination by her co-counsel testifying that the approximately $241,800 in funds withdrawn as cash from her IOLTA account between November 13 and December 7, 2018, were earned fees that she had withdrawn as part of her purported practice of zeroing out her IOLTA account at the end of each year. *Id.* at 72:9-73:23.

On January 15, February 20, March 6, and April 3, 2019, the defendant provided further false sworn testimony to the bankruptcy court about the estate funds deposited into her IOLTA account. More specifically:

- On January 15, 2019, the defendant continued her false testimony regarding the factual reality underlying the activities in her IOLTA account with the concealed funds. *See* Exhibit J at 4:6-72:16.

- On February 20, 2019, the defendant was examined about, among other things, her January 14 testimony regarding the location of the approximately $241,800 in cash drawn from her IOLTA account. After being confronted with the fact that her personal bank records did not support her prior testimony, defendant testified that she had given $250,000 to a client/business partner, who she refused to identify, for a

11

business venture that she and the anonymous individual were undertaking. *See* Exhibit K at 143:13-156:9. Underlying defendant's testimony on February 20 was the false premise that the cash drawn from the IOLTA account was the defendant's property, and she explicitly repeated that falsehood during redirect testimony from Mr. Borges:

> Q.    Now, of the 201 or $250,000, you indicated that you did share some of that money with your brother?
>
> A.    Well, not really share. It was placed when I --
>
> Q.    Well, loaned --
>
> A.    -- returned from the bank in a safe to which he also had access to.
>
> Q.    You also submitted an affidavit that you had submitted some money for your brother's attorneys' fees.
>
> A.    Of course.
>
> Q.    And that money went to my law firm.
>
> A.    It sure did.
>
> Q.    And you submitted affidavits indicating that that was your money --
>
> A.    Yes. Those were my earned fees.

Exhibit K at 167:6-22. Because the defendant refused to identify the individual to whom she had purportedly given the $250,000, the bankruptcy court held her in contempt and ordered her incarcerated until she provided the information.

12

- On March 6, 2019, the defendant identified the individual whom she gave $250,000 as Lawrence Lis, *see* Exhibit L at 50:7-11, and went on to describe her purported property development venture with Mr. Lis. *Id.* at 59:16-62:2. After defendant was initially unable to provide an address or contact information for Mr. Lis, a number was eventually obtained. During a break in the proceeding, the trustee's counsel called the number and spoke with an individual who identified himself as Lawrence Lis, and this individual denied ever receiving any funds from the defendant. *Id.* at 76:2-7. The bankruptcy court released the defendant from custody on March 6, 2019, as she had identified Mr. Lis as the individual whom she gave the $250,000. *Id.* at 87:18-22.

- On March 11, 2019, the defendant failed to appear at a hearing in the bankruptcy court and her then-attorney, Frank Avila, reported that he had been terminated as her counsel and sought leave to withdraw. After the hearing was underway, the bankruptcy court asked Mr. Avila if he had spoken with the defendant that day and he responded as follows:

> MR. AVILA: I did. She texted me.
>     She said she was with the police filing a report and the police were still with her. I don't know all of the exact nature. She did -- I did text with her, and I did call her. And I did briefly speak to her, and she said she was with the police.
>
> THE COURT: Where is she exactly?
>
> MR. AVILA: She was at her office on Cermak.
>
> THE COURT: I thought you said she was at the police department?

> MR. AVILA: Well, I believe the police went to her office. She was making a report with the police. I did not say she went to the police department. I said she was making a report with the police. And apparently that was at her office.
>
> I'm not with her, and I don't want any misunderstandings. But she said some money was stolen and computers are missing from her office, and she filed a police report.

Exhibit M at 24:13-25:7.

- On March 20, 2019, the defendant was present when Larry Lis appeared and testified in the bankruptcy court. Mr. Lis testified that he had neither received any funds nor had any business dealings with the defendant in the prior year. *See* Exhibit N at 16:18-20:16.

- On April 3, 2019, the defendant appeared before the bankruptcy court, persisting in her testimony that she had given the $250,000 to Larry Lis, but now adding that Lis had returned it to her on February 10 or 17, 2019, while they watched the Grammy's on television in her office, and that she put it in a lockbox, which she later discovered, upon returning to her office on March 11, 2019, had been stolen. *See* Exhibit O at 28:7-33:3. Defendant testified that she had the $250,000 in her office on February 20, 2019, the day that she was held in civil contempt for refusing to identify the individual that she had claimed to have given the funds to, *id.,* at 33:12-15, and she repeated her false refrain: "[t]hats my money that I earned." *Id.* at 33:19.

The police report that defendant filed to support her story that the funds had been stolen was most certainly false. To date, the bankruptcy trustee has not been able to recover the funds cycled through the defendant's IOLTA account.

### III. LOSS CALCULATIONS AND RESTITUTION

**A. Loss Attributable to the Concealment**

The defendant effected the concealment of $357,492.92 from the Kowalski Bankruptcy Case estate through her fraudulent use of her IOLTA account. This figure is net and does not double-count funds cycled through the account.

### IV. ARGUMENT

Before imposing a sentence of imprisonment or a term of supervised release, the Court must calculate the applicable advisory Guidelines range and consider the factors set forth in 18 U.S.C. § 3553(a). *See Gall v. United States*, 552 U.S. 38, 46 (2007). If a term of supervised release is imposed, the Court must consider defendant's offense conduct and the factors set forth in 18 U.S.C. §§ 3583(c) and 3553(a)(1), (a)(2)(C), and (a)(2)(D) in fashioning specific supervised release conditions. *See United States v. Thompson*, 777 F.3d 368, 377 (7th Cir. 2015); *United States v. Siegel*, 753 F.3d 705, 716-17 (7th Cir. 2014). In this case a sentence within the advisory Guidelines range is sufficient but not greater than necessary to satisfy the goals of Section 3553(a).

**A. The Advisory Sentencing Guidelines Range**

The advisory Guidelines calculations are based on the November 2021 version of the Sentencing Guidelines Manual. The government and the Probation Office agree

that the defendant's criminal history category is I.  PSR ¶¶ 32-40.  The government's proposed Guidelines calculations are the same as those in the PSR, and are set forth below.

### 1. Offense Level Calculations (Count Fifteen)

A. <u>Base Offense Level</u>. The parties and the Probation Office agree that base offense level for a violation of 18 U.S.C. § 152(1) is 6, pursuant to Guideline § 2B1.1(a)(2). Dkt. 670 at ¶ 9.b.i; PSR ¶ 18.

B. <u>Enhancement for Loss</u>. The government and the Probation Office agree that defendant's offense level is increased by 12 levels, pursuant to Guideline § 2B1.1(b)(1)(G), because the loss exceeded $250,000, but was less than $550,000, as set forth above. PSR ¶ 19.

C. <u>Bankruptcy Enhancement</u>. The parties and the Probation Office agree that pursuant to Guideline § 2B1.1(b)(9)(B) the offense level is increased by 2 levels because the offense involved a misrepresentation and other fraudulent action during the course of a bankruptcy proceeding. Dkt. 670 at ¶ 9.b.iii; PSR ¶ 20.

D. <u>Sophisticated Means</u>.  The government and the Probation Office agree that defendant's offense level is increased by two pursuant to Guideline § 2B1.1(b)(10)(C) because the offense involved sophisticated means.  PSR ¶ 21.  As set forth in the Government's Version on pages 4-6, the sophisticated means include the defendant's use of her attorney trust account and a fictitious trust.

E. <u>Role in the Offense</u>. The government agrees with the Probation Office's application of a two-level enhancement pursuant to § 3B1.3 because defendant used

16

her position as an attorney to assist in the commission of the offense. PSR ¶ 23. The government did not include this enhancement in its initial calculation set forth in the Plea Agreement and Government's Version, but, upon reflection, believes it is well founded. A § 3B1.3 enhancement is applicable when a defendant (a) occupied a position of trust, and (b) the abuse of that position of trust significantly facilitated the crime. *United States v. Emerson*, 128 F.3d 557, 562 (7th Cir. 1997). Here, the defendant's fraud was perpetrated not just through the use of the attorney trust account that she had as a result of her status as a lawyer, but also through her use of her position as an attorney and officer of the court to make written and oral representations to the bankruptcy court that she knew to be materially false. Defendant's use of her capacity as an attorney in the commission of the offense warrants the enhancement for abuse of position of trust or use of special skill under § 3B1.3. *See*, *e.g.*, *United States v. Gellene*, 182 F.3d 578, 597 (7th Cir. 1999) (Enhancement applicable to bankruptcy attorney who lied in sworn representations to bankruptcy court because position of trust violated with respect to client and also because he "abused his position of trust as an officer of the bankruptcy court by using his fraudulent sworn document to verify his perjurious sworn testimony.").

F. Acceptance of Responsibility. The parties and the Probation Office agree that a two-level reduction for acceptance of responsibility under Guideline § 3E1.1(a) is appropriate. Dkt. 670 at ¶ 9.b.v; PSR ¶ 27. The parties and the Probation Office agree that a one-level reduction for acceptance of responsibility under Guideline § 3E1.1(b) is appropriate. Dkt. 670 at ¶ 9.b.vi; PSR ¶ 28.

G. <u>Summary</u>. To summarize, the government's Guidelines calculations are below; enhancements that are not agreed by all parties are italicized.

| Guideline Provision | Count Fifteen |
|---|---|
| Base offense level – U.S.S.G. § 2B1.1(a)(2) | 6 |
| *Enhancement for loss amount between $250,000 and $500,000 – U.S.S.G. § 2B1.1(b)(1)(G)* | *+12* |
| Enhancement for misrepresentation and other fraudulent action in bankruptcy proceeding - U.S.S.G. § 2B1.1(b)(9)(B) | +2 |
| *Enhancement for sophisticated means – U.S.S.G. § 2B1.1(b)(10)(C)* | *+2* |
| *Enhancement for abuse of position of trust or special skill – U.S.S.G. § 3B1.3* | *+2* |
| Reduction for acceptance of responsibility – U.S.S.G. § 3E1.1(a) | -3 |
| **TOTAL** | **21** |

## 2. Advisory Guidelines Range

The government calculates that the defendant's total offense level is 21 and her criminal history category is I, resulting in an advisory Guidelines range for Count Fifteen of 37 to 46 months' imprisonment.

## B. A Guidelines Range Sentence Is Appropriate Under Section 3553(a)

### 1. The Nature and Circumstances of the Offense

Defendant's offense was a serious one – she effected the concealment of approximately $357,492 from a bankruptcy estate through many dozens of transactions with her attorney trust account, multiple material false statements in a written pleading filed with a court, and copious amounts of sworn testimony from the witness stand that was augmented by fabricated client ledgers and retention agreements that the defendant presented as real. This was not a crime that occurred

18

within a momentary lapse in judgment. It was an ongoing effort, with significant energy and thought invested in deceiving creditors, the Chapter 11 Trustee, and the bankruptcy court. The defendant's testimony at the January 14, 2019, hearing in the Kowalski Bankruptcy Case demonstrates just how far she was willing to go to conceal the funds. She clearly walked into the courtroom with a practiced narrative supported by newly created documents, and the story was materially at odds with the truth. She did not at any point recant her false representations, and instead proceeded to build on the story at later hearings. The defendant was a licensed attorney who made a decision at many dozens of different points – with each transaction in the IOLTA account, with the creation of each fabricated document, and with each appearance as a witness in the bankruptcy court – to deceive and continue the concealment of assets.

## 2. Defendant's History and Characteristics

The defendant has no prior convictions which yield criminal history points.

The defendant has had strained relations with her siblings for extended periods over the last several decades, and has undoubtedly been impacted by the mental health and substance abuse challenges of her two children, both of whom were young adults by the time of the offense. The defendant has also reported attending counseling from 1994 to 2000, having several physical ailments, and at times potentially problematic drinking. *See* PSR ¶ 87 (In January 2020, "the defendant reported 'heavier use' of alcohol in 2018 and subsequent 'overuse' of alcohol to soften symptoms of panic attacks.")

The defendant is well educated, having earned an undergraduate degree in psychology and a law degree. PSR ¶¶ 91-92. A portion of the defendant's law-related employment history appears to have been challenged, with one employer accusing her of, among other things, dishonesty. *See* PSR ¶ 97 ("On numerous occasions, Ms. Kowalski failed to appear in court when required, which put me at risk of clients not paying or filing complaints against the firm. Ms. Kowalski breached her fiduciary duty to my firm and our clients. She attempted to conduct a law practice as a sole practitioner using her personal cell phone number but my law firm's address. When confronted she offered a prevarication that the case was taken in on a pro bono basis, yet a retainer fee in the amount of $6000 was received by her.")

There is nothing in the defendant's history that directly or transparently ties to or mitigates the offense conduct in this case. The defendant's legal training aggravates insofar as the defendant had a better sense of the harm she was causing than would an individual lacking such training or understanding. Defendant was an officer of the court. She abused that position by repeatedly lying to the bankruptcy court.

### 3. The Need To Provide Just Punishment, Afford Adequate Deterrence, Protect the Public, and Promote Respect for the Law

For the defendant, specific deterrence is a factor. Although her law license is currently suspended, and the prospect of disbarment is near certain, that alone is not sufficient to impart specific deterrence. After all, many convicted attorneys resume practicing after a period of time. Defendant's determination in staying on the criminal

course during the offense, despite many opportunities to stop and the many times she was confronted by and in the bankruptcy court, clearly demonstrate to this Court that she needs a significant period of incarceration.

Additionally, general deterrence and promotion of respect for the law are very significant concerns with respect to the defendant's sentence. The numerous dishonest actions taken by defendant, in multiple settings including a federal courtroom, are a serious assault on the legal system. The defendant attempted to use her status as an attorney to conceal property that belonged to a bankruptcy estate, and then to cover up that concealment with fraudulent documents and false testimony. The public at large needs to see that an attorney who behaves in such a manner is held accountable to promote respect for the law, and attorneys who might consider using dishonest means to shield or steal assets under cover of their attorney status must see serious consequences, consistent with the advisory Guidelines, for general deterrence to be achieved through the sentence. *See United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it.")

## C. Restitution and Fine

Restitution is mandatory, pursuant to 18 U.S.C. § 3663A. The bankruptcy estate in the Kowalski Bankruptcy Case is the sole immediate victim, and it should receive restitution of $357,492.92. There have been no payments or offsets to date.[6]

Due to the amount of restitution owed, a fine is not appropriate.

## D. Recommended Conditions of Supervised Release

Due to the lengthy and brazen nature of defendant's scheme, a term of supervised release of three years is warranted. Additionally, a lengthy term of supervised release will allow the Probation Office to monitor defendant's payments against her restitution obligation.

Consistent with this Court's standing order, the government's proposed conditions of supervised release are attached as Exhibit P.

---

[6] When defendant was arrested, law enforcement seized approximately $3,000 from her person. The government intends to seek a turnover order, which would allow those funds to be applied against any restitution ordered by this Court.

22

# V. CONCLUSION

Accordingly, government respectfully requests that defendant be sentenced within the advisory Guidelines range of 37 to 46 months' incarceration, followed by 3 years' supervised release.

Respectfully submitted,

JOHN R. LAUSCH, JR.
United States Attorney

By:    /s/ Jeffrey Snell
JEFFREY SNELL
Special Assistant United States Attorney
JEREMY DANIEL
BRIAN NETOLS
MICHELLE PETERSEN
KRISTIN PINKSTON
Assistants United States Attorneys
219 South Dearborn Street, 5th Floor
Chicago, IL 60604

Date Submitted: January 20, 2023